IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ROBIN ALPERT, | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| ABINGTON PAIN MEDICINE | : | No. 16-0020 |
| P.C., et al., | : | |
| Defendants. | : | |

## MEMORANDUM OPINION

TIMOTHY R. RICE                                                    September 20, 2016
U.S. MAGISTRATE JUDGE

This dispute concerns the sale of a medical practice in which the parties failed to live up to their most basic obligations to each other.  This breakdown ruined a working relationship that had the potential to be, according to the parties' own testimony, beneficial for the parties, their employees, and their patients.  As explained below, I find the defendants jointly and severally liable to the plaintiff for $250,000 for breach of contract, in addition to interest, fees, and costs.

I make the following findings of fact and conclusions of law by a preponderance of the evidence pursuant to Federal Rule of Civil Procedure 52.

## FINDINGS OF FACT

1.      Plaintiff Robin Alpert, a/k/a Robin Gordon ("Gordon") sold Defendant Abington Pain Medicine P.C. ("APM") to Defendants Vincent J. Thompson, III, M.D. ("Thompson") and Paul Edward Parker Thompson  ("Paul Thompson") on December 19, 2014.  Plaintiff's Proposed Findings of Fact and Conclusions of Law (doc. 29) ("Pl."), ¶ 8; Defendant's Proposed Findings of Fact and Conclusions of Law (doc. 30) ("Def."), ¶ 5; N.T. 7/19/16 at 19.

2.      To effectuate this transaction, Gordon and the defendants executed four agreements that are relevant to this case: (1) a Stock Purchase Agreement; (2) a Secured

Promissory Note; (3) a Security Agreement; and (4) an Employment Agreement, and no party disputes that they are binding contracts on all parties.  See July 7, 2016 Order (doc. 21) regarding Plaintiff's Uncontested Motions in Limine, barring Defendants from introducing any evidence that the Promissory Note and Employment Agreement are not authentic, fully integrated agreements; Pl., ¶ 21; Def., ¶ 8.

       3.      Thompson was not represented by counsel during this transaction.  Def., ¶ 26; N.T. 7/19/16 at 94.

       4.      The individual defendants agreed to pay Gordon $250,000 for APM pursuant to the Stock Agreement.  Stock Agreement, § 2.

       5.      The individual defendants' payments were scheduled to be made in 36 monthly installments beginning approximately two and a half years after the purchase, on June 14, 2017, secured by the Promissory Note.  Stock Agreement, § 2; Promissory Note, § 1.

       6.      The Promissory Note provided that the entire $250,000, along with interest, would be due immediately upon an "Event of Default," which included failure by APM to perform under the Employment Agreement.  Promissory Note, § 5(b).

       7.      In the Security Agreement, APM agreed to guarantee the individual defendants' obligations under the Promissory Note.  Security Agreement, § 1.

       8.      The term of the Employment Agreement commenced June 19, 2015, and required Gordon to work for APM for two years, for a compensation package with various components, including a salary that had the potential to increase if APM became more profitable. Employment Agreement, § 4.

9.      The Employment Agreement also provided a severance payment that would be owed to Gordon if she was terminated by APM for any reason, including for "cause." Employment Agreement, § 7.

10.     Gordon alleges all defendants breached the Security Agreement, and that Thomas and APM breached the Employment Agreement.  Complaint (doc. 1) at 7-8.

11.     Although Thompson is not a party to the Employment Agreement between Gordon and APM, see Employment Agreement, as APM's sole shareholder and President, Thompson acted on APM's behalf with respect to Gordon's employment, see Stock Agreement, §§ B, 6.

12.     The following four provisions of the Employment Agreement are critical to the outcome of this case:

A.  Section 1 of the Employment Agreement provides:

> Employment.  [APM] agrees to employ [Gordon], and [Gordon] agrees to be employed by [APM], for the term provided herein and upon the terms and conditions set forth herein.

B.   Section 7(c) of the Employment Agreement provides:

> Termination for Cause.  With the exception of [Termination Upon Death] and [Termination Upon Disability], [Gordon's] employment hereunder may only be terminated for Cause.  For purposes of this Agreement, "Cause" shall mean, as determined by the Board in good faith, in its reasonable discretion, any one or more of the following: (i) any breach by [Gordon] of any material obligation under this Agreement which, if curable, is not cured within thirty (30) days after written notice to [Gordon] of such breach; (ii) the commission by [Gordon] of any act or acts involving fraud, embezzlement, misappropriation, theft, breach of fiduciary duty or dishonesty against the property or personnel of [APM] or any of its affiliates; or (iii) the charging or indictment of [Gordon] of (or [Gordon's] plea of guilty or not contest to) a felony or misdemeanor involving moral turpitude.  The termination of this Agreement for Cause shall be effective upon [APM's]

3

provision of written notice thereof to [Gordon], which describes the reasons thereafter in reasonable detail.

C.      Section 7(d) of the Employment Agreement provides:

> Termination by Employee Without Cause. [Gordon] may terminate this Agreement at any time and without cause by giving ninety (90) days prior written notice of [Gordon's] intention to terminate this Agreement. [Gordon] shall not be entitled to the Severance Payment pursuant to Section 7(e) below in the event that [Gordon] elects to terminate her employment hereunder without cause in accordance with this Section 7(d) prior to the conclusion of the initial 24-month Term of this Agreement.

D.      Section 7(e) of the Employment Agreement provides:

> Severance. If [Gordon's] employment hereunder is terminated before the Term commences or during the initial 24-month Term of this Agreement for any reason other than termination by [Gordon] without cause pursuant to Section 7(d) above, [APM] shall pay to [Gordon] a lump sum cash payment in the amount of $150,000 (the "Severance Payment"). The Severance Payment shall be paid to [Gordon] by [APM] within five (5) business days of [Gordon's] last date of employment hereunder (or, if the Term has not yet commenced, within five (5) business days' notice of such termination). [Gordon] and [APM] agree that the Severance Payment is a fair and reasonable measure of the damages [Gordon] would sustain as a result of such termination when considering, without limitation, the terms of, and the respective rights and obligations of [APM], [Gordon], and Vincent J. Thompson, III, M.D. under this Agreement, the SPA, the Note and the Security Agreement, respectively.

13.      The terms of the contract show the parties' intended to reward Gordon if the practice grew more lucrative. It guaranteed her either two years of continued employment at approximately $75,000/year or a severance payment of $150,000, and then payment of the remaining $250,000 in monthly installments beginning after her two-year employment term, or a total of $400,000, as long as she continued to invest in APM's success by working there for two more years.

4

14.     Gordon and her husband continued working for APM after the sale, but before the Employment Agreement commenced on June 19, 2015, many of Gordon's responsibilities, including ordering supplies and writing checks, were transitioned to another employee.  Pl., ¶ 22; N.T. 7/19/16 at 31.

15.      Throughout her employment at APM, Gordon was responsible for billing and answering phones.  Pl., ¶ 22; Def., ¶ 10; N.T. 7/19/16 at 31-32.

16.     In April, May, and June 2015, Gordon traveled to Florida three times and was away from work for several days recovering from surgery.  Pl., ¶¶ 24-26; Def., ¶¶ 12-13; N.T. 7/19/16 at 143, 181.

17.     Gordon requested not to be paid during her April trip to Florida, but was paid during her May trip and during her surgical recovery.  Pl., ¶¶ 24-25; Def., ¶ 13; N.T. 7/19/16 at 65, 143, 181.

18.     Gordon failed to perform her billing duties during her trips to Florida.  Def., ¶ 14; N.T. 7/19/16 at 182-85.

19.     Gordon's testimony, that she was entitled to her full salary during her trips to Florida because "[w]henever they needed [her] [she] would answer the phone," N.T. 7/19/16 at 50, was not credible in light of other testimony and the reality of operating a medical practice.

20.     Gordon did not perform work for APM during her June 2015 trip to Florida.  Id. at 109-10.

21.     Near the end of Gordon's third trip to Florida, in June 2015, she and her husband learned neither of them were going to be paid for the pay period ending June 18, 2015.  Pl., ¶ 36; Def., ¶ 15; N.T. 7/19/16 at 38, 42.

22.     Thompson did not pay Gordon because she had already been paid for two weeks of vacation leave, she had left the state, and she had failed to perform work for APM.  Def., ¶ 28; N.T. 7/19/16 at 183.

23.     On June 18, 2015, a day before the Employment Agreement was set to commence, Gordon's husband called Thompson and said he and Gordon resigned.  Def., ¶ 22; N.T. 7/19/16 at 142, 184.

24.     I reject Gordon's testimony that she "figured" she had been fired when she was not paid.  N.T. 7/19/16 at 45.  Such a claim is inconsistent with her husband's and Thompson's testimony, and defies common sense.

25.     I credit the testimony of Gordon's husband that he told Thompson he and Gordon "resign[ed]."  Id. at 154.  His version was consistent with the parties' conduct and other evidence.  The subsequent claim of Gordon's husband, that when he was not paid he "assumed" he was fired, was not credible.  Id. at 141.  It appears to be a belated attempt to bolster Gordon's self-serving claim.

26.     I credit Thompson's testimony that Gordon's husband stated he and his wife resigned and then texted the same information to the practice manager.  Id. at 108.

27.     Thompson never had a chance to fire Gordon because Gordon's husband submitted her resignation before she could be fired, and before the Employment Agreement took effect.

28.     After resigning on June 18, 2015, Gordon subsequently offered to resume employment via text message in July 2015, but her offer was declined.  Def., ¶ 25; N.T. 7/19/16 at 55.

6

29.     On November 25, 2015, Gordon sent a letter to all defendants, advising that they had breached the Employment Agreement by failing to pay Gordon compensation and severance, and demanding that they cure this default within 30 days, as required by Section 7(e) of the Employment Agreement.  November 25, 2015 Letter, p. 2.

30.      No defendant made payments or an offer of employment to Gordon within 30 days of November 25, 2015, as required by Section 7(e) of the Employment Agreement.  N.T. 7/19/16 at 54, 105.

## CONCLUSIONS OF LAW

1.     Gordon claims defendants breached the Employment Agreement, and therefore owe her damages pursuant to the Employment Agreement and Promissory Note.  Complaint, at 7-9.  She also seeks liquidated damages, pursuant to the PA Wage Payment and Collections Law ("WPCL"), 43 P.S. § 260.1, et seq.  Id. at 9-10.

### Breach of Contract – Counts I and II

1.     To state a claim for breach of contract under Pennsylvania law,[1] Gordon must allege: (1) a contract existed; (2) which was breached; and (3) she suffered damages because of that breach.  Davis v. Wells Fargo, 824 F.3d 333, 351 (3d Cir. 2016) (citing McShea v. City of Philadelphia, 606 Pa. 88, 97 (2010)); see also Alpart v. Gen. Land Partners, Inc., 574 F. Supp. 2d 491, 502 (E.D. Pa. 2008) (citing CoreStates Bank, N.A. v. Cutillo, 723 A.2d 1053, 1058 (Pa. Super. 1999)).

2.     I must first determine whether the contract language is ambiguous.  Pacific Employers Ins. Co. v. Global Reinsurance Corp. of America, 693 F.3d 417, 426 (3d Cir. 2012).

---

[1]      Pennsylvania law governs in this diversity action.  Stock Purchase Agreement, § 12; Promissory Note, § 11; Employment Agreement, § 9(d).

If the contract language is ambiguous, I must determine the parties' intent based on the document's language and "in the light of the obligation as a whole."  Id.

3.       Ambiguous contract terms are interpreted against their drafter.  Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52, 62-63 (1995); Viera v. Life Ins. Co. of N. Am., 642 F.3d 407, 419 (3d Cir. 2011); Prusky v. Reliastar Life Ins. Co., 502 F. Supp. 2d 422, 432, n. 18 (E.D. Pa. 2007), aff'd, 532 F.3d 252 (3d Cir. 2008).

4.       Contracts should not be interpreted to lead to absurd results.  Manufacturers & Traders Trust Co. v. Germansville Feed & Farm Supply, Inc., No. 2494 EDA 2013, 2014 WL 10986126, at *3 (Pa. Super. Feb. 7, 2014) (citing Stamerro v. Stamerro, 889 A.2d 1251 (Pa. Super. 2005)).

5.       Because no party disputes that the Stock Purchase Agreement, Secured Promissory Note, and Employment Agreement are binding on all parties, Gordon's burden as to the first element of her breach of contract claim is satisfied.  Davis, 824 F.3d at 351.

6.       Gordon's first breach of contract claim is legally dependent on her second claim because, pursuant to the Secured Promissory note, the $250,000 payment is accelerated if APM materially breached the Employment Agreement.  See Secured Promissory Note, §5(b).

7.       Gordon presents four legal theories alleging APM breached the Employment Agreement.  Her first theory is that Thompson fired her without cause, and thus owed her the severance payment.  Pl., ¶¶ 49-51.  Her second theory is that Thompson fired her with cause, which would also entitle her to the severance payment.  Id. at ¶¶ 52-59.  Her third theory is that because her employment ended before the contract's term began, she was again entitled to the severance payment.  Id. at ¶¶ 61-67.  Her fourth theory is that defendants materially breached

their obligation by failing to pay her compensation and severance, as well as failing to cure these breaches when notified of them in writing.  Id. at ¶¶ 68-73.

8.    Because I conclude Gordon was not fired, her first two legal theories lack merit.

9.    Gordon's third theory turns on interpreting Section 7(e) of the Employment Agreement.  I find Section 7(e) of the Employment Agreement ambiguous because it excuses severance payment when the employment is terminated "by [Gordon] without cause pursuant to Section 7(d)," but does not define the parties' obligations when those two clauses – "without cause" and "pursuant to Section 7(d)" – conflict.  Employment Agreement, § 7(e).

10.    Looking at the parties' obligations as a whole, Pacific Employers Ins. Co., 693 F.3d at 426, they agreed that the individual defendants would pay Gordon $400,000 over five years for APM, as long as Gordon kept working at APM for two years.

11.    The Employment Agreement provides Gordon a severance payment when her employment terminated before the end of two years in every circumstance, including termination with cause, except one: if she resigned without cause.  Employment Agreement, § 7.

12.    Because Thompson's obligation to pay Gordon under the Employment Agreement was specifically conditioned on her performing work for APM beginning on June 19, 2015, refusing to pay Gordon on June 18, 2015 did not constitute cause for Gordon to resign, as contemplated by the agreement.  Employment Agreement, § 4(a) ("For her services during each year of the Term hereof, [Gordon] shall receive a Total Compensation Package").

13.    I conclude Gordon resigned without cause, and is not entitled to severance under the Employment Agreement, as she claims in her third legal theory.

14.    Gordon's fourth legal theory claims defendants were required in November 2015 to cure their failure to pay her compensation and severance.  See November 25, 2015 letter.

15.     Because Gordon did not perform any services for which she was not compensated, defendants did not fail to pay her compensation and did not owe her severance. Gordon's fourth breach of the Employment Agreement theory also fails.

16.     Nevertheless, Gordon claims that even if she resigned, she did so without the written notice required under Section 7(d) of the Employment Agreement, which required Thompson and APM to provide her with written notice and an opportunity to cure her breach. N.T. 7/19/16 at 202-03.  According to Gordon's theory, defendants' failure to provide Gordon written notice of her breach of Section 7(d) was itself a breach of the Employment Agreement, triggering an obligation to pay severance.  Id.  Such an interpretation would lead to the absurd result of rewarding Gordon for summarily resigning.  Manufacturers & Traders Trust Co. v. Germansville Feed & Farm Supply, Inc., 2014 WL 10986126, at *3.

17.     APM, however, had a contractual obligation to employ Gordon when she offered to resume employment in a July 2015 text message, and when she offered written notice of breach in November 2015.  Employment Agreement, § 1.  By failing to comply, APM materially breached its obligation to employ her.  Id.

18.     APM's failure to perform its obligations under the Employment Agreement constituted a default under the terms of the Promissory Note.  This default triggers acceleration of the $250,000 payment, along with all accrued and unpaid interest, costs, and attorney's fees. Promissory Note, § 5.

19.     Thompson and Paul Thompson are liable for APM's breach of the Employment Agreement, pursuant to the Promissory Note.  Promissory Note, § 5(b).

20.     Pursuant to the Security Agreement, APM guarantees Thompson and Paul Thompson's obligations under the Promissory Note.  Security Agreement, § B.

21.     Thus, all defendants are jointly and severally liable for damages owed under the Promissory Note.

22.     Defendants owe Gordon $250,000 in accelerated payment, as well as attorney's fees, costs, and prejudgment interest.

**Unpaid Wages – Liquidated Damages Claim Against Thompson and APM, Count III**

23.     Under the WPCL, employers that fail to pay compensation owed to employees are liable for those amounts in addition to liquidated damages and attorney's fees.  43 P.S. §§ 260.10, 260.9a(f).

24.     The WPCL, however, "does not create a statutory right to wages."  Harding v. Duquesne Light Co., 882 F. Supp. 422, 427 (W.D. Pa. 1995).  Even in the context of a WPCL claim, whether wages are owed depends on the terms of the employment contract.  Id. (citing Weldon v. Kraft, Inc., 896 F.2d 793, 801 (3d Cir. 1990)).

25.     APM's duty to compensate Gordon was conditioned on her providing services. Employment Agreement, § 4(a).

26.     Because Gordon provided no uncompensated services to APM, no damages are owed pursuant to the WPCL.  Weldon, 896 F.2d at 801.

27.     An appropriate Order follows.